# IN THE SUPREME COURT OF IOWA

No. 18–0825

Filed October 11, 2019

**STATE OF IOWA,**

Appellee,

vs.

**BENJAMIN G. TRANE,**

Appellant.

---

Appeal from the Iowa District Court for Lee County, Mark Kruse, Judge.

The former owner of a school for troubled youth appeals his convictions for assault with intent to commit sexual abuse, pattern or practice of sexual exploitation by a counselor or therapist, and child endangerment. **AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Alfredo Parrish and Adam Witosky of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

The former owner of a now-shuttered school for troubled youth was convicted of three criminal charges—(1) assault with intent to commit sexual abuse, (2) pattern, practice, or scheme to engage in sexual exploitation by a counselor or therapist, and (3) child endangerment. The first two convictions involved acts of sexual misconduct against a former female student. The third conviction related to the school's physical mistreatment of two former male students when each was confined for long periods of time in an isolation room. The defendant appeals.

On appeal, the defendant raises the following claims of error: (1) the district court abused its discretion in excluding evidence the female student made false allegations of sexual abuse against her adoptive and foster parents without conducting a rule 5.412 hearing; (2) the district court erred in refusing to consider allegations of ineffective assistance of counsel at the motion-for-new-trial stage and before appeal; (3) the district court should have severed the two counts involving the female student from the count involving the male students for trial purposes; (4) the district court should not have permitted testimony by a state expert witness that purportedly vouched for the credibility of the female student; (5) the district court erred in instructing the jury that they could find child endangerment by determining that *either* of the male students had been victimized, without requiring the jury to agree on a single victim-student; and (6) there was insufficient evidence to support the defendant's convictions.

On our review, we find the evidence sufficient to sustain the defendant's convictions. We also hold the district court did not err in declining to consider ineffective-assistance claims as part of the motion-

for-new-trial proceedings. However, we hold the district court should have conducted a rule 5.412 hearing before or during trial to determine, by a preponderance of the evidence, whether the female student made false accusations of sexual abuse against her adoptive or foster parents. We therefore conditionally affirm the defendant's convictions but remand with directions for the court to conduct such a hearing. The defendant's remaining arguments are before us only as ineffective-assistance-of-counsel claims; we conclude they should be addressed (if necessary) in a postconviction-relief proceeding.

## II. Facts and Procedural History.

In the fall of 2002, Benjamin Trane and his wife moved from Utah to Iowa with hopes of establishing a private, therapeutic boarding school for troubled teens. Their efforts paid off, and Midwest Academy opened its doors in June 2003 in Keokuk. Eventually, Trane became the sole owner of the school. Midwest Academy offered programming unique from that of other private, military, or residential schools, rendering it appealing to parents of teens with a variety of behavioral and disciplinary struggles. Midwest Academy purported to offer a combination of character-building, therapeutic, and educational programming, although it operated outside the purview of the Iowa Board of Education and its licensing requirements.

Midwest Academy functioned under a rules-and-consequences-based levels system, providing structure for its cognitive behavioral therapy program. There were six levels that students could ascend (or descend) through as part of the program. All students began at Level 1, the most restrictive level. Examples of restrictions at Level 1 included not being permitted to use condiments with food, not being allowed to look in a mirror or out of windows, and being allowed to speak with students at higher levels only at specified times. Students could earn greater freedom

through a points-based reward system while working up through the program. For example, Level 2 came with the ability to get second helpings at mealtime, Level 3 offered the ability to speak with family members by telephone, and Level 4 permitted off-campus trips.

A number of students, however, were unable to progress past Level 1, and their inability to do so sometimes resulted in harsh consequences. Relevant to the child endangerment charge was the use of Out-of-School Suspension (OSS) rooms. OSS rooms were designed for a single student to occupy for up to twenty-four hours at a time, with constant supervision. The OSS rooms were employed as a "last ditch effort" to curb undesirable behaviors; for instance, constant distractions in the classroom or physical attacks on an instructor would land a student in OSS. While in OSS, the student was expected to sit in structure except for bedtime, meaning he or she could choose from one of three positions in which to sit without moving.[1] The lights in the OSS room were always on. Should the student break structure without permission or otherwise act out, the twenty-four-hour clock would reset.

A.H. and B.V. were each confined in an OSS room for significant periods of time. A.H. arrived at Midwest Academy in May 2014 when he was twelve years old. A.H. had been diagnosed with anxiety, depression, and oppositional defiant disorder, and had been unsuccessfully treated at a psychiatric hospital. A.H.'s psychiatrist recommended Midwest Academy to A.H.'s parents. At Midwest Academy, A.H. continued his pattern of defiance, and as a result, he spent approximately half of his time in OSS. While in OSS, A.H. engaged in behavior such as urinating on the walls, punching his own nose to make it bleed, and throwing his chewed-

---

[1]Breaks were allowed for bathroom use and meals.

up food at the surveillance camera. When A.H.'s parents removed him from Midwest Academy after approximately a year, A.H.'s weight had declined from 120 to 90 pounds.

B.V. was admitted to Midwest Academy a few months after A.H., when he too was twelve years old. B.V. came to the school with a diagnosis of attention deficit hyperactivity disorder and bipolar disorder, as well as a past history of assaultive behavior. While at Midwest Academy, B.V. spent at least 133 of his 210 days in OSS—sixty-three percent of his time at Midwest Academy. While in OSS, B.V. defecated and urinated in the room and often refused to eat. By the time B.V. left Midwest Academy in March 2015, his weight had gone down from 115 pounds to 89 pounds.

In March 2015, the Iowa Department of Human Services (DHS) received a hotline tip that students were being held at Midwest Academy in isolation to the detriment of their health. Accordingly, DHS opened an inquiry. The Federal Bureau of Investigation (FBI), having already received similar information, contacted DHS to coordinate investigations into the alleged abuse at Midwest Academy.

Meanwhile, in December 2015, the Iowa Division of Criminal Investigation (DCI) was asked to look into a possible sexual abuse case at Midwest Academy involving K.S., a seventeen-year-old female student. At Midwest Academy, each student was assigned a "family representative." Trane, the owner, was also the family representative for four students, including K.S. As K.S.'s family representative, Trane controlled what level K.S. was on, whether K.S. could call home, and whether K.S. could go on outings.

Like other students at Midwest Academy, K.S. had undergone a troubled childhood before entering the school. She had been adopted by her aunt and uncle when she was eight years old. (Her adoptive mother

was the sister of her biological father.) Before that, K.S. had lived in foster care and with her grandparents. In January 2015, after K.S. ran away from her adoptive home, K.S.'s adoptive parents arranged for her to be sent to Midwest Academy.

In late 2015, K.S. disclosed to a night-time staff member named Cheyenne Jerred that Trane had been sexually abusing her, and Jerred reported the allegations to DHS. K.S.'s disclosure to Jerred apparently came the day after Trane delivered to K.S. the ill-received news that she would not be permitted to travel off campus with anyone for Thanksgiving. The allegations were later investigated by DCI.

Over the course of several interviews with DCI, K.S. disclosed the following incidents of sexual contact with Trane: (1) Trane pulled K.S.'s pants down enough to expose her underwear under the guise of looking for and photographing distinctive birthmarks for the Child Protection Center (CPC);[2] (2) after lights out, Trane knelt next to K.S.'s bed while she faced away from him and slid his hand under the covers, under her shorts, and into her vagina;[3] (3) Trane placed K.S.'s hand over the groin area of his pants while he developed an erection; (4) Trane unbuttoned K.S.'s uniform pants and put his finger into her vagina while she visited his home with other students; (5) Trane videotaped himself engaging in sexual intercourse with K.S. and ordered K.S. to clean the floor where the act occurred so that K.S. would be permitted to call her sister; (6) Trane had sexual intercourse with K.S. on at least one other occasion; (7) Trane had K.S. perform an act of oral sex on him; (8) Trane had K.S. perform a

---

[2]The CPC was involved with K.S. because of events that had occurred prior to her admission to Midwest Academy.

[3]The beds were lined up against the wall, and students were required to face the wall while sleeping or else they would lose points in the levels system.

manual masturbatory act on him while he guided her hands with his; and (9) Trane moved his groin against K.S. while laying fully clothed on top of K.S.

Shortly after DHS was notified, K.S. was removed from Midwest Academy. Trane consistently denied having any sexual contact with K.S. None of the incidents were directly corroborated by any witnesses other than K.S.

However, in addition to K.S.'s allegations of sexual abuse, K.S. and others testified that Trane would conduct a "body image" exercise. During this exercise, each female student was instructed to go off alone in a private room, disrobe, look at herself in a full-length mirror, and determine what shape her body was, such as "pear-shaped" or "apple-shaped." Trane and the girls would then discuss their body shapes as a group. The body image exercise was supposedly intended to provide guidance on diet and exercise habits. At trial, Trane testified that "in hindsight" he would not have conducted this exercise because "it sounds bad."

Also, Trane instructed students, including K.S., to complete an anonymous written survey. The survey included questions on sexual subjects such as when the student first learned about sex, when the student had her first sexual experience, when the student lost her virginity, and when the student first masturbated. At trial, Trane and his wife testified that there were surveys taken on various subjects, not just sexual subjects.

Trane also brought upper-level female students to Victoria's Secret for their birthdays. One witness explained that this was to allow a student the privilege of getting the kind of bras and underwear she was not normally allowed to have in the school, where the dress code was strictly regimented. For K.S.'s seventeenth birthday, Trane took K.S. and another

female student out for sushi and shopping. This included a stop at Victoria's Secret, where K.S. testified she "didn't let him buy [her] anything."

On January 28, 2016, law enforcement executed a search warrant at Midwest Academy, interviewed every student enrolled, shut down the facility, and sent all of the children home. Two further searches were performed on February 1 and February 11, generating a vast amount of paper and electronic evidence that was subsequently digitized. Digitization of the evidence was completed over a year later in April 2017. The files amounted to between five and six terabytes of data.

On September 18, 2017, Trane was charged by trial information in the Iowa District Court for Lee (South) County with one count of sexual abuse in the third degree in violation of Iowa Code sections 709.1 and 709.4(1)(*a*) (2015); one count of sexual exploitation by a counselor or therapist in violation of Iowa Code sections 709.15(1), 709.15(2)(*a*)(1), and 709.15(4)(*a*); and one count of child endangerment in violation of Iowa Code sections 726.6(1)(*a*) and 726.6(7). Trane pled not guilty and asserted his right to a speedy trial, which was then set for December 12.

As previously noted, the discovery materials were voluminous. Moreover, the discovery contained the identifying information of hundreds of persons that would have been unwieldy to redact. As a result, the parties entered a nondisclosure discovery agreement on October 27.

On November 16, Trane, who was represented by appointed counsel, moved for approval of a $200–$250 purchase expense of an external hard drive on which the State could provide a copy of these voluminous discovery materials. In his motion, Trane asserted the State would only provide discovery on a newly purchased hard drive. The trial court granted

Trane's motion, and he obtained this discovery on November 28—fourteen days before trial and on the first day of depositions.

K.S., who now resided out of state, was deposed on December 11, the afternoon before trial was to begin. In her deposition, she testified that she had previously made allegations of sexual abuse against her foster parents and her adoptive parents. Upon conferring with K.S.'s adoptive mother following the deposition, Trane's counsel filed a rule 5.412 motion that evening. The motion asserted that K.S. had made prior false allegations of sexual abuse against both sets of parents and sought to "introduce testimony through both cross-examination and through the complaining witness' adoptive mother as to the falsity of those allegations." The motion elaborated that "prior false allegations are not considered 'prior sexual behavior' and therefore do not fall within the protections of Rule 5.412." The motion was time-stamped 5:39 p.m. on December 11.

The State resisted Trane's motion. The State maintained that the motion was untimely, since it was being filed on the eve of trial. *See* Iowa R. Evid. 5.412(*c*)(1)(A) (generally requiring motions based on an exception to rule 5.412 to be filed at least fourteen days before trial).[4] The State further maintained that the motion was deficient because it was not accompanied by an offer of proof. Lastly, the State urged that the motion should be denied on the merits because "K.S. has never recanted her prior abuse allegations."

---

[4]The State had filed a motion in limine on December 7 that asked for the exclusion, *inter alia*, of

> [a]ny testimony or evidence of sexual history or other reports of sexual abuse made by the victim in Count I. Such evidence is inadmissible pursuant to Iowa Rule of Evidence 5.412, is irrelevant, and its prejudicial effect is not outweighed by its probative value. Furthermore, defendant has not provided notice of intent or a written offer of proof to submit such evidence in accordance with 5.412(*c*)(1) and (2) and is therefore precluded from eliciting such testimony.

On December 12, following jury selection, the court allowed the parties to make a further record on the motion. Trane's counsel recounted her conversation with K.S.'s adoptive mother:

> I explained to her what it was specifically that [K.S.] was accusing her specifically of as far as sexual abuse, and she made it clear that that was not true, and this was a pattern of behavior that [K.S.] would engage in of making false allegations against her and her husband, both of a physical abuse nature and a sexual abuse nature.
>
> She would also testify that my advising her was the first she knew of--she knew that there had been sexual abuse allegations, but she did not know exactly what they entailed. And she would further testify that they simply weren't true.

The district court expressed concern about permitting a telephonic deposition of K.S.'s adoptive mother for purposes of a rule 5.412 hearing. However, the district court also asked Trane's counsel, "[W]ould [the statements you have made] be substantially what [the adoptive mother] would say if she was called as a witness, if you were to make an offer of proof?" Trane's counsel agreed they would be.

Trane's counsel added further detail as to what she had learned from K.S.'s deposition. Apparently, the allegations of physical abuse had arisen before K.S. arrived at Midwest Academy. They had been investigated and determined to be unsubstantiated. Upon K.S.'s arrival at Midwest Academy, she had also made allegations of sexual abuse against both her adoptive parents and her foster parents.

The State responded that Trane's motion should not be heard because it was too late: "The Defendant wanted a speedy trial, and this is of his making."

The district court denied Trane's motion. It concluded that the motion was untimely. Turning to the merits, it also found:

> The information before the court requires the court speculate to a degree that is inconsistent with a finding that there was a false claim of sexual abuse as set forth in the Motion filed by the defendant by a preponderance of the evidence.

At trial, K.S. and B.V. (but not A.H.) testified for the State. Additionally, the State offered expert testimony from Dr. Anna Salter, a forensic psychologist. During her testimony, Dr. Salter spoke of a "double standard" as between how the public responded to the "Boston Strong" phenomenon following the Boston Marathon bombing and how the public responds generally to survivors of sexual abuse who do not complain about the abuse and continue to interact with their abusers. Less directly, Dr. Salter referred to the then-ongoing and high-profile case of the physician-trainer who had sexually abused many athletes on the United States Women's Olympic Gymnastics Team. Dr. Salter also testified that sexual abuse allegations are false "roughly 2 to 8 percent" of the time. Trane did not object to this testimony.

Both Trane and Trane's wife testified for the defense. The State and the defense called other witnesses as well, including former students and staff.

The district court's marshaling instruction on count III, child endangerment, did not require the jury to agree that a specific child—either A.H. or B.V.—had been endangered. Rather, it stated as follows:

> Under Count III of the Trial Information, the State must prove all of the following elements of Child Endangerment:
>
> 1. On or between September 18, 2014, and January 31, 2016[,] the defendant was the person having custody or control of [B.V.] *and/or* [A.H.]
>
> 2. [B.V.] *and/or* [A.H.] were under the age of fourteen years.
>
> 3. The defendant knowingly acted in a manner that he was creating a substantial risk to [B.V.] *and/or* [A.H.]'s physical or mental or emotional health or safety.

> If the State has proved all of the elements, the defendant is guilty of Child Endangerment. If the State has failed to prove any one of the elements, the defendant is not guilty of Child Endangerment.

(Emphasis added.)

On December 22, 2017, the jury returned its verdicts. On count I, which involved K.S., it found Trane guilty of the lesser included offense of assault with intent to commit sexual abuse, rather than the charged offense of sexual abuse.[5] On count II, also involving K.S., the jury found Trane guilty of a pattern, practice, or scheme to engage in sexual exploitation by a counselor or therapist. Finally, on count III, involving B.V. "and/or" A.H., the jury found Trane guilty of child endangerment.

Before the imposition of sentence, Trane retained new counsel who filed a motion for a new trial. This motion asserted the trial court erred in denying Trane the opportunity to present proof of K.S.'s false allegations of prior sexual abuse by her adoptive and foster parents. Further, the motion sought to raise ineffective assistance of trial counsel in various forms, including trial counsel's failure to make a more timely rule 5.412 motion, failure to move for severance of counts I and II from count III, failure to object to improper vouching by Dr. Salter, and failure to object to the "and/or" jury instruction regarding child endangerment. The State resisted the motion and, in the course of its resistance, also objected to consideration of any ineffective-assistance-of-counsel arguments at the motion-for-new-trial phase.

On May 11, 2018, the case came on for sentencing. The district court overruled Trane's motion for a new trial. It then sentenced Trane

---

[5]Confronted with K.S.'s graphic descriptions of repeated sexual abuse, and Trane's denials of any sexual contact, the jury reached what was arguably a compromise verdict.

consecutively to two years on the assault with intent to commit sexual abuse charge; five years on the pattern, practice, or scheme to engage in sexual exploitation by a counselor or therapist charge; and two years on the child endangerment charge. *See* Iowa Code § 902.9(1)(*e*); *id.* § 903.1(2). Trane timely appealed, and we retained the appeal.

### III.  Standard of Review.

We review district court rulings on the admissibility of evidence, including admissibility under Iowa Rule of Evidence 5.412 in criminal prosecutions, for abuse of discretion. *State v. Alberts*, 722 N.W.2d 402, 407 (Iowa 2006). "Reversal is warranted only upon showing the 'court exercise[d] its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Id.* at 408 (alteration in original) (quoting *State v. Mitchell*, 568 N.W.2d 493, 497 (Iowa 1997)).

In evaluating sufficiency-of-evidence claims, we will uphold a verdict if substantial evidence supports it. *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *State v. Reed*, 875 N.W.2d 693, 704–05 (Iowa 2016)). The jury is entitled to reject a party's evidence and credit the evidence against it. *See State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

### IV. Was There Sufficient Evidence to Sustain Trane's Convictions?

Trane has raised a number of arguments on appeal. We will begin with the claim that the evidence was insufficient to sustain Trane's convictions. If the trial record would not support a conviction on a given count, Trane is entitled to an acquittal on that count, and further proceedings on that count must come to an end.

**A. Assault with Intent to Commit Sexual Abuse.** A person commits assault with intent to commit sexual abuse when the person assaults another with the specific intent to commit a sex act by force or against the other's will. *See* Iowa Code §§ 709.1, .11. An assault is "[a]ny act . . . intended to place another [person] in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act." *Id.* § 708.1(2)(*b*).

Here, the jury heard K.S. testify that Trane repeatedly and forcibly inserted his finger in her vagina and repeatedly grabbed her hand and put it over his groin area. K.S.'s testimony, standing alone, is sufficient to support Trane's conviction on this count.

**B. Pattern, Practice, or Scheme of Conduct to Engage in Sexual Exploitation by a Counselor or Therapist.** The elements required to be shown are that (1) the defendant was a counselor or a therapist providing mental health services to the victim, (2) the victim was emotionally dependent on the defendant, (3) the victim was a client or patient, and (4) the defendant committed a pattern, practice, or scheme of conduct to engage in sexual conduct with the victim for the purpose of arousing or satisfying the sexual desires of the defendant or victim. Iowa Code *Id.* § 709.15(1)–(2). The pattern or practice need not involve multiple victims or an extended period of time; it merely requires "an ongoing pattern, practice or scheme of conduct to sexually exploit" at least one protected person. *See State v. Wickes*, 910 N.W.2d 554, 569 (Iowa 2018).

The jury heard evidence that Trane was K.S.'s family representative and provided counseling services to her. The jury also heard K.S. testify as to her vulnerability, her reliance on Trane, and his repeated sex acts with her. Sufficient evidence was presented to sustain this charge.

**C. Child Endangerment.** Child endangerment occurs when a person having custody or control over a child "[k]nowingly acts in a manner that creates a substantial risk to [the] child's . . . physical, mental[,] or emotional health or safety." Iowa Code § 726.6(1). A.H. and B.V. were both under fourteen years old when they entered Midwest Academy. Trane was the owner and the de facto director of the school. Trane put into place policies that allowed A.H. and B.V. to be held in OSS for days on end even if they were not eating and were engaging in acts of self-harm. Further, the State presented evidence that Trane was personally aware of A.H.'s and B.V.'s confinement and its effects. He testified that he stopped by OSS "every single day." Both children left Midwest Academy having lost large amounts of weight. Trane knew that B.V. was losing weight. After leaving Midwest Academy, B.V. was hospitalized for malnutrition. There was sufficient evidence to sustain this conviction as well.

In sum, although conflicting evidence was presented on all three counts, a reasonable jury could have found Trane guilty taking the evidence as a whole.

**V. Did the District Court Abuse Its Discretion in Not Holding a Rule 5.412 Hearing?**

**A. Iowa's Rape Shield Law and the Exception for False Allegations of Sexual Activity.** Iowa Rule of Evidence 5.412, Iowa's rape shield law, prohibits introduction of reputation or opinion evidence of a complaining witness's other sexual behavior and substantially limits the admission of evidence of specific instances of a complaining witness's other sexual behavior.[6] Its purpose "is to protect the victim's privacy,

---

[6]Iowa Rule of Evidence 5.412 reads, in part,

encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters." *State v. Edouard*, 854 N.W.2d 421, 448–49 (Iowa 2014) (quoting *Alberts*, 722 N.W.2d at 409), *overruled in part on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016). As a result, "[t]he rule presupposes that much evidence which the accused wishes to place before a jury will be excluded." *State v. Alvey*, 458 N.W.2d 850, 853 (Iowa 1990), *abrogated in part on other grounds by State v. Baker*, 679 N.W.2d 7, 11 (Iowa 2004).

A question we had to answer earlier was whether the rape shield statute applied to evidence that a victim had made a false *allegation* of sexual behavior. In *Baker*, we held that the defendant should have been permitted to introduce this type of evidence. *See* 679 N.W.2d at 12. We stated, "Because a false allegation of sexual activity is not sexual behavior, such statements fall outside both the letter and the spirit of the rape-shield law." *Id.* at 10.

In *Alberts*, however, we refined this holding. While we reiterated that a false allegation of sexual conduct is not barred from admissibility by rule 5.412, we acknowledged the risk of undermining the rape shield law itself. *Alberts*, 722 N.W.2d at 409. Thus, we stated,

> In keeping with the policy behind our rape-shield law, it is imperative that a claim of sexual conduct (or misconduct) by the complaining witness be shown to be false before it is

The following evidence is not admissible in a criminal proceeding involving alleged sexual abuse:

(1) Reputation or opinion evidence offered to prove that a victim engaged in other sexual behavior

(2) Evidence of a victim's other sexual behavior other than reputation or opinion evidence.

The rule previously restricted evidence of "past" sexual behavior. *See* Iowa R. Evid. 5.412(*a*)–(*b*) (July 2009). Effective January 1, 2017, it was amended to cover evidence of "other" sexual behavior, whether the behavior preceded the alleged sexual abuse or not. *See id.* r. 5.412(*a*)(1)–(2) (Dec. 2016, eff. Jan. 1, 2017).

admissible at trial. Allowing the jury to make the initial determination of the truth or falsity of the alleged statement "would contradict the purpose of rape-shield laws—which is to prohibit a jury from considering evidence about an alleged victim's sexual conduct, unless a judge first determines that such evidence is manifestly necessary to achieve a fair trial." Thus, we hold a criminal defendant wishing to admit such evidence must first make a threshold showing to the trial judge outside the presence of the jury that (1) the complaining witness made the statements and (2) the statements are false, based on a preponderance of the evidence.

*Id.* (quoting *State v. Quinn,* 490 S.E.2d 34, 40 (W. Va. 1997)). More specifically, we added,

Under our rape-shield law, a defendant intending to offer evidence of specific instances of the complaining witness's past sexual behavior must first make a written motion to offer such evidence not later than 15 days before the trial date. Iowa R. Evid. 5.412(*c*)(1). This procedural requirement would also apply to allegedly false claims of sexual conduct because they are covered by the rape-shield law unless proven to be false. The motion must be accompanied by a written offer of proof and the trial court must order a hearing in chambers to determine the admissibility of such evidence. *Id.* [§] 5.412(*c*)(2).[7]

*Id.* at 409 n.3.

In other words, our court made it clear in *Alberts* that allegedly false allegations of past (now other) sexual behavior may be admitted only through the rule 5.412 exceptions framework, which involves pretrial notice, a written offer of proof, and an in camera hearing. *Id.* Further, even if the threshold of proof by a preponderance of evidence is met, the district court must still determine that the evidence is relevant and that the probative value of the proposed false allegations outweighs the danger of unfair prejudice. *See id.* at 411; *see also* Iowa R. Evid. 5.412(*c*)(2)(C) (Dec. 2016).

---

[7]The fifteen-day timeline was amended, effective January 1, 2017, to fourteen days. *Compare* Iowa R. Evid. 5.412(*c*)(1) (July 2009), *with id.* r. 5.412 (*c*)(1)(A) (Dec. 2016, eff. Jan. 1. 2017).

**B.  Merits.**  We must determine whether the district court abused its discretion when it denied Trane's motion for a rule 5.412 hearing, which was filed the day before trial.  As noted, the district court denied the motion on grounds of untimeliness and failure of proof.

We have grappled with these issues to some extent before.  In *Baker*, in the district court, the defendant filed a notice to present evidence of prior false allegations made by the complaining witness; the state filed a motion in limine to prevent the introduction of such evidence; and the court held a hearing to resolve the issue, ultimately granting the state's motion in limine.  679 N.W.2d at 9.  On appeal, we granted a new trial after balancing probative value against unfair prejudice.  *See id.* at 12.

Two years later, in *Alberts*, the defendant argued he should have been able to present proof of an incident in the recent past where the complaining witness allegedly falsely blamed a man for having "trapped" her while she was skinny dipping.  722 N.W.2d at 405, 407.  The defendant argued that this incident supported his defense that he and the complaining witness had engaged in consensual sex, but she had then falsely accused him of rape.  *Id.* at 406.  We held that the incident was presumptively covered by the rape shield law and inadmissible.  *Id.* at 409.  However, if the defendant could establish in a rule 5.412(*c*) in camera hearing that the complaining witness's description of the nonconsensual nature of the skinny dipping incident was false, the event would not be covered by the rape shield law and would be potentially admissible.  *Id.*

As in *Baker*, the defendant had not followed the procedure of rule 5.412(*c*).  *Id.* at 405; *see Baker*, 679 N.W.2d at 9 n.1.  He had not filed a motion for a rule 5.412 hearing; this issue came before the court on the state's motion in limine.  *Alberts*, 722 N.W.2d at 405.  But we held a

rule 5.412 hearing would be the required course of action on remand and in future cases. *Id.* at 409, 412.

Two years after that, in *Millam v. State*, we decided that the failure of the defendant's trial counsel to offer evidence that the complaining witness had made similar accusations of sexual abuse against another boyfriend of her mother prejudiced the defendant and undermined confidence in the trial's outcome. 745 N.W.2d 719, 724 (Iowa 2008). The charges involved sexual abuse of a seven-year-old girl. *Id.* at 721. The defendant was the boyfriend of the girl's mother at the time of the alleged abuse. *Id.* In his application for postconviction relief, the defendant asserted his trial counsel had discovered the girl had made similar accusations of sexual abuse against one of her mother's other boyfriends and had later recanted. *Id.* at 722. The defendant's trial counsel, however, did not attempt to introduce the evidence by way of a rule 5.412 motion or at trial, incorrectly believing that it was excluded by Iowa's rape shield law. *Id.* This error led us to find ineffective assistance of counsel and reverse and remand. *Id.* at 724.

For present purposes, we first consider whether Trane's rule 5.412 motion was timely. Rule 5.412(*c*)(1)(A) requires the defendant to

> [f]ile a motion to offer the evidence at least 14 days before trial unless the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence, or that the evidence relates to an issue that has newly arisen in the case, and the court sets a different time.[8]

---

[8]Rule 5.412 was modeled after Federal Rule of Evidence 412, which became effective in 1973. As of January 1, 2017, a number of amendments were made to rule 5.412 to bring it into conformity with later amendments to the federal rule. For example, the fifteen-day timeline referenced in *Alberts* was changed to fourteen days in the new rule 5.412(*c*). *Compare* Iowa R. Evid. 5.412(*c*)(1) (July 2009), *with id.* r. 5.412(*c*)(1)(A) (Dec. 2016, eff. Jan. 1, 2017). *See generally* Iowa Supreme Ct. Order, *In re Adoption of the Nonsubstantive Restyling of the Iowa Rules of Evidence*, https://www.iowacourts.gov/iowa-courts/supreme-court/orders/archive/2016/ (Iowa

Iowa R. Evid. 5.412(*c*)(1)(A). Obviously, Trane did not file his motion at least fourteen days before trial. Trane counters that he did not learn of the allegedly false sexual abuse allegations until he deposed K.S. the day before trial. Moreover, he points out that the State scheduled the deposition of K.S. (who by then lived some distance from Iowa) to occur the day before trial and that depositions generally were delayed because the State did not make its document trove available until fourteen days before trial.

In its appellate briefing, the State does not dispute these points. In other words, the State appears to concede that the evidence was "newly discovered and could not have been obtained earlier through the exercise of due diligence . . . ." *Id.* Instead the State faults Trane for standing on his speedy trial rights. *See* Appellee's Br. 55 ("It was Trane's insistence on invoking his speedy trial right despite has lawyer's pleas for more time that created the rape shield timeliness issue."). Notably, the trial transcript indicates that Trane's counsel tried to persuade him to waive speedy trial. Trane refused.

Yet Trane's refusal to waive speedy trial should not have been fatal to the success of his rule 5.412 motion if the motion was based on newly discovered evidence that could not have been obtained earlier. The fourteen-day deadline is excused in these circumstances. The district court's decision failed to take into account the rule's own exception to the fourteen-day deadline.

---

Sept. 28, 2016). However, when we updated rule 5.412 in 2017 we did not incorporate *one* of the federal changes, which replaced "unless the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence, or that the evidence relates to an issue that has newly arisen in the case, and the court sets a different time," with "unless the court, for good cause, sets a different time." *Compare* Iowa R. Evid. 5.412(*c*)(1)(A), *with* Fed R. Evid. 412(c)(1)(B).

It is true that without a continuance, there would have been practical difficulties in holding a rule 5.412 hearing. Trial was already beginning. Certainly, the complaining witness had rights to be protected. Any prior incident had to get through the screening process described in *Alberts* before it could be admitted. And the State was entitled not to be prejudiced by last-minute surprises.

We have said that "good cause for pretrial delay under the speedy-trial rule can result from the need to complete pretrial discovery." *State v. Winters*, 690 N.W.2d 903, 909 (Iowa 2005) ("[D]efendants do not forfeit their speedy-trial rights by pursuing discovery of the State's evidence."). Recently, in *State v. Veal*, we reviewed a case where the defendant had made incompatible demands for last-minute discovery on a fair-cross-section jury pool claim and for a speedy trial. 930 N.W.2d 319, 331–32 (Iowa 2019). The district court resolved the conflict by granting a brief continuance. *Id.* Yet before doing so, it had a candid on-the-record discussion with defense counsel in the presence of the defendant where it explained that granting the requested discovery would result in going slightly beyond the speedy trial deadline. *Id.* On appeal, we approved the district court's decision to grant this limited trial delay, finding that the defendant's discovery request constituted good cause. *Id.* at 332.

We believe the district court's approach in *Veal* is a good one to follow when a defendant justifiably raises an important motion at the eleventh hour, having demonstrated that the motion could not have been raised earlier, but granting the motion could push the trial past a speedy trial deadline that the defendant is declining to waive. If the dilemma is not the defendant's fault, the defendant should not be hoisted on its horns. Rather, to the extent necessary, the court should make clear to the defendant that granting the motion will push the trial past the speedy trial

and, if the defendant insists on pursuing the motion, find good cause under Iowa Rule of Criminal Procedure 2.33(2)(*b*) for extending the speedy trial deadline. The district court here took a different path and decided that the defendant's speedy trial demand trumped the defendant's rule 5.412 motion. We think the *Veal* approach is sounder, under which the court itself balances the two rights instead of forcing the defendant to pick and choose.

The State relies on a number of distinguishable out-of-state cases in arguing that Trane's motion was untimely. In *Mayo v. Commonwealth*, the Kentucky Supreme Court noted that a "trial court ha[s] the discretion to rely upon the lack of notice alone to exclude testimony about the victim's sexual history [under the rape shield law]." 322 S.W.3d 41, 49 (Ky. 2010). There, the defendant sought to introduce evidence of his own past consensual intercourse with the victim, his spouse, under the rape-shield exception in Kentucky. *Id.* at 48. Clearly the defendant knew of the past sexual conduct at the time of the motion deadline, and the defendant did not require the aid of the discovery process to uncover this information. *See id.*

In *Roberson v. State,* the Mississippi Court of Appeals likewise affirmed the denial of an untimely attempt to admit evidence of a victim's prior sexual conduct. 61 So. 3d 204, 221 (Miss Ct. App. 2010) (en banc). But again, the case is distinguishable. The day before trial (as is the case here), the defendant "sought permission . . . to inquire into prior sexual accusations that had been made by [the victim]." *Id.* at 208. However, his motion only stated that "[i]t ha[d] recently been discovered by the defense that . . . when questioned about the source of a perceived pregnancy, the alleged victim admitted to her mother that she had engaged in sexual intercourse with [a third party]." *Id.* at 212. The defendant made no

written offer of proof as to a prior *false* sexual allegation. *Id.* The district court ruled that Roberson failed to show in his untimely motion that the evidence he wished to introduce was newly discovered, failed to show the allegation was false, and failed to submit a proper written offer of proof. *Id.* at 221–22. Also, importantly, the timeline in *Roberson* was distinct from that before this court. In *Roberson*, the defendant was arrested and indicted in July 2007, and the ruling on the motion occurred nearly two years later in May 2009—nothing like the accelerated timeline in this case coupled with the discovery issues. *Id.* at 207, 211.

In *State v. Poitra*, the North Dakota Supreme Court affirmed the exclusion of evidence because the defendant had not filed a timely motion or provided notice to the victim. 785 N.W.2d 225, 234 (N.D. 2010). In *Poitra*, the State waited until the case was within fourteen days of trial, at which point it filed a motion to exclude any evidence of the victim's past sexual behavior based on the defendant not having filed a motion. *Id.* at 234. The defendant resisted, but did not claim the victim had made *false* allegations of sexual misconduct in the past. *Id.* Additionally, approximately a year had passed from the defendant's indictment until the defendant resisted the exclusion of evidence. *Id.* at 229, 234. *Poitra* does not present the same temporal and discovery restraints as this case.

In *United States v. Seymour*, the United States Court of Appeals for the Sixth Circuit found that the failure of the defendant to provide notice under Federal Rule of Evidence 412(c)(1) rendered the evidence inadmissible. 468 F.3d 378, 387–88 (6th Cir. 2006). There, the defendant had attempted unsuccessfully to admit the testimony of an individual who had seen the defendant and the adult female victim at a party, hugging and kissing and acting as if they were a couple two years after the alleged sexual assault. *Id.* at 386. On appeal, for the first time, the defendant

asserted that the testimony should have been admitted under a rule 412 exception as evidence of consensual sexual behavior between him and the adult female victim. *Id.* The court reviewed the contention under plain error review, and it ruled that the failure to move for introduction of such evidence prior to trial was a ground for denial. *Id.* Again, no prior false allegations of sexual misconduct were involved, and as in *Mayo*, the defendant would have known about the evidence because it involved his own behavior. *See id.*; *Mayo*, 322 S.W.3d at 48.

In *United States v. Ramone*, the Tenth Circuit held that the failure to timely serve notice provided a sufficient basis for a trial court to exclude proffered Rule 412 evidence. 218 F.3d 1229, 1235 (10th Cir. 2000). In that case, the defendant attempted to introduce evidence of a prior consensual relationship with the victim. *Id.* at 1232, 1234–35. He timely filed his initial Rule 412 motion. *Id.* at 1234–35. However, after the motion deadline, he supplemented his motion by offering evidence of his entire sexual relationship with the victim. *Id.* at 1235. Because the supplementation was untimely and the district court found no good cause to excuse the delay, it excluded the untimely supplemental proffer. *Id.* at 1235–36 ("The advisory committee notes indicate that good cause for late filing may be shown through newly discovered evidence that could not have been obtained at an earlier time through due diligence."). These facts simply do not line up to the case before this court presently. The defendant there clearly knew all along about his own conduct.

In *United States v. Eagle Thunder*, the Eighth Circuit held that the failure of the defendant to timely serve notice was sufficient to warrant exclusion of Rule 412 evidence. 893 F.2d 950, 954 (8th Cir. 1990). That case is, again, distinguishable. The defendant attempted to introduce evidence of a nonrecent tear in the eleven-year-old victim's hymenal ring

under the injury exception to Federal Rule of Evidence 412. *Id.* The district court in *Eagle Thunder*, while noting that the defendant failed to follow the procedure of submitting a written offer of proof, ruled on relevancy grounds that the "non-recent tear was not relevant to the source of the tears that were hours old." *Id.*

Pertinent to our review of the notice requirement in Iowa's rape shield law is the United States Supreme Court's decision in *Michigan v. Lucas*, 500 U.S. 145, 111 S. Ct. 1743 (1991). In that case, the Court reviewed the timeliness requirement in Michigan's rape shield statute, which required a written motion and an offer of proof within ten days of arraignment, i.e., much earlier than in Iowa. *Id.* at 147, 111 S. Ct. at 1745. The Michigan Court of Appeals had found the notice-and-hearing requirement violative of the Sixth Amendment "in all cases where it is used to preclude evidence of past sexual conduct between a rape victim and a criminal defendant." *Id.* at 148, 111 S. Ct. at 1746.

The Supreme Court reversed. It held,

> [T]he Michigan Court of Appeals erred in adopting a *per se* rule that Michigan's notice-and-hearing requirement violates the Sixth Amendment in all cases where it is used to preclude evidence of past sexual conduct between a rape victim and a defendant. The Sixth Amendment is not so rigid. The notice-and-hearing requirement serves legitimate state interests in protecting against surprise, harassment, and undue delay. Failure to comply with this requirement may in some cases justify even the severe sanction of preclusion.

*Id.* at 152–53, 111 S. Ct. at 1748. Yet the Supreme Court cautioned,

> This does not mean, of course, that all notice requirements pass constitutional muster. Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence "may not be arbitrary or disproportionate to the purposes they are designed to serve."

*Id.* at 151, 111 S. Ct. at 1747 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S. Ct. 2704, 2711 (1987)).

Later, the Supreme Court clarified that *Lucas* "did not even suggest, much less hold, that it is unconstitutional to enforce such a rule unless a case-by-case balancing of interests weighs in favor of enforcement." *Nevada v. Jackson*, 569 U.S. 505, 511, 133 S. Ct. 1990, 1993 (2013) (per curiam). In *Jackson*, the Supreme Court reversed the Ninth Circuit for upholding federal habeas relief for a state prisoner who had failed to give timely notice under Nevada's rape shield law. *Id.* at 506, 510, 133 S. Ct. at 1990–91, 1993.

We read *Lucas* and *Jackson* together as standing for the proposition that states may impose and enforce *reasonable* notice requirements for rape shield exceptions. But what makes rule 5.412 reasonable is the escape valve for newly discovered evidence that could not have been obtained earlier with reasonable diligence. Defense counsel here demonstrated without rebuttal that they did not have access to the information needed to file a rule 5.412 motion until the eve of trial. Under these circumstances the escape valve applied. This would of course be a different case if, for example, K.S. had been deposed three weeks before trial.

We now turn to the district court's alternative ground for excluding the evidence—namely, that Trane had failed to prove the allegations of sexual abuse were false by a preponderance of the evidence. However, the district court reached this conclusion on the basis of insufficient information and without holding an in camera rule 5.412 hearing. *See* Order 4, Dec. 17, 2017) ("The information before the court requires the court speculate . . . ."). The very purpose of the hearing is to enable the court to assess whether the allegations were false or not by a preponderance of evidence after hearing directly from relevant witnesses, which would include, in this case, K.S. and her adoptive mother. We share

the district court's view that allegations cannot be deemed true or false simply based on defense counsel's verbal offer of proof as to what the mother *would* say if called to testify. That is the function of the in camera hearing.

Having said all this, we would not find that the district court abused its discretion in failing to hold a proper rule 5.412 hearing unless the evidence concerning the prior false allegations—*if indeed they were false*—was relevant and important, and its probative value outweighed the danger of unfair prejudice. We went through this step in the analysis in *Alberts*. *See* 722 N.W.2d at 411–12. Likewise, we will do so here.

We believe the evidence could have been valuable to Trane's defense. Apparently there were no third-party witnesses to any of the alleged incidents of sexual contact. Thus, the State's case rested on the relative credibility of K.S. and Trane.[9] Also, the allegedly false report of sexual abuse by the adoptive parents occurred fairly close in time to the report of sexual abuse by Trane. Additionally, both reports related to authority figures. Trane's defense theory was that K.S. had leveled sexual abuse charges against him in retaliation for being forced to stay at the school over the Thanksgiving holiday. K.S.'s allegations concerning her adoptive

---

[9]As the State said in closing argument (while perhaps oversimplifying the State's burden of proof),

> If you can't reconcile the conflict--because in this case you can't reconcile the conflict. [K.S.] said it happened. He said it didn't. So if you can't reconcile that conflict, accept the evidence you find more believable. What do you find more believable? Who do you find more believable? What do you find more credible? Who do you find more credible? Don't throw up your hands. Make a decision.

> . . . .

> Her testimony is believable, and it is proof beyond a reasonable doubt. Her testimony alone, if you believe it and you find it to be consistent with what else you know, her testimony alone is beyond a reasonable doubt. Because you do have to decide who to believe.

parents—if false—would have supported that defense theory, since K.S. made them after the adoptive parents had caused her to be brought to the school.

One court has observed that "[t]he ability to cross-examine a witness about prior false accusations is at the core of the fundamental right to confront because such evidence goes to the witness's *motive*." *Perry v. Commonwealth*, 390 S.W.3d 122, 131, 134 (Ky. 2012) (reversing the trial court's ruling excluding evidence of prior false allegations under the rape shield law and remanding because the trial court did not hold a proper hearing). This observation needs to be tempered with a recognition of the important policies served by the rape shield statute—protection of victims and their privacy, avoiding trials of victims rather than perpetrators, and ensuring that victims of sexual abuse are encouraged to report.[10]

We therefore conclude the court abused its discretion in not holding an in camera rule 5.412 hearing on Trane's motion and, if necessary, delaying briefly the trial. The remedy that we order is the same as in *Alberts*. That is, "we remand for a hearing to determine whether [K.S.] made these statements and if so, whether they are false." *Alberts*, 722 N.W.2d at 412. If the district court finds after such a hearing that Trane has made the required showing by a preponderance of the evidence, "then a new trial shall be granted." *Id.* If Trane fails to make such a showing, "then his conviction stands," *id.*, unless reversal is warranted on some other ground.

---

[10]As we said in *State v. Ogilvie*,

> One purpose of rape shield laws is to protect the privacy of victims. Another is to encourage the reporting and prosecuting of sex offenses. A third reason is to prevent time-consuming and distracting inquiry into collateral matters.

310 N.W.2d 192, 195 (Iowa 1981) (citation omitted); *see also Mitchell*, 568 N.W.2d at 497.

**VI. Did the District Court Err in Refusing to Consider Ineffective-Assistance-of-Counsel Claims That Were Raised in Trane's Motion for New Trial?**

As we have noted, Trane's motion for new trial departed from customary practice by raising a number of ineffective-assistance-of-counsel claims. The district court indicated it would not consider those claims, but it allowed Trane's new counsel to make an offer of proof by calling trial counsel to the stand. Following that testimony, the court reiterated that Trane's ineffective-assistance claims were not properly before it, but the court seemingly went on to reject some of those claims on the merits. In its written order, the court stated, "[T]o the extent it was heard, or should have been heard in a motion for new trial, any allegation of ineffective assistance of counsel was unproven or there was insufficient record to prove it." On our review of the record, it is not clear which claims if any the district court rejected on the merits as "unproven." On appeal, both Trane and the State agree that Trane was not permitted to fully litigate his ineffective-assistance claims, and neither side identifies a specific claim as having been considered and turned down on the merits.

Trane argues that ineffective assistance of counsel may be raised in a motion for new trial and that the district court should have fully considered his claims. As he points out, Iowa Rule of Criminal Procedure 2.24(*b*)(9) authorizes the district court to grant a new trial "[w]hen from any other cause the defendant has not received a fair and impartial trial." However, that rule wording was already in place in 2004, when the general assembly passed the following legislation:

> 1. *An ineffective assistance of counsel claim in a criminal case shall be determined by filing an application for postconviction relief pursuant to chapter 822, except as otherwise provided in this section.* The claim need not be raised on direct appeal from the criminal proceedings in order to preserve the claim for postconviction relief purposes.

2. A party may, but is not required to, raise an ineffective assistance claim on direct appeal from the criminal proceedings if the party has reasonable grounds to believe that the record is adequate to address the claim on direct appeal.

3. If an ineffective assistance of counsel claim is raised on direct appeal from the criminal proceedings, the court may decide the record is adequate to decide the claim or may choose to preserve the claim for determination under chapter 822.

2004 Iowa Acts ch. 1017, § 2 (codified at Iowa Code § 814.7) (emphasis added). We believe the 2004 legislation made clear that the only avenues for raising ineffective assistance were postconviction relief and direct appeal. The district court did not err in refusing to consider Trane's ineffective-assistance-of-counsel claims.

Not only statutory language but also practical considerations support this ruling. Ineffective-assistance claims typically require additional record development. Allowing them to be litigated in posttrial motions would likely delay judgment and sentencing in many cases. That occurred here, as judgment and sentencing did not occur until May 2018 even though the jury verdicts had been returned in December 2017.

**VII. Should We Find on Appeal that Ineffective Assistance Occurred?**

Trane argues alternatively that we should resolve his ineffective assistance claims now on direct appeal. In *State v. Macke*, ___ N.W.2d ___, ___ (Iowa 2019), we held that claims of ineffective assistance may be decided on direct appeal if the appeal was already pending on July 1, 2019, when Senate File 589 became effective. Here Trane filed and served his notice of appeal on May 10, 2018. Accordingly, under the version of Iowa Code section 814.7 that was in effect before July 1, 2019, those claims may be raised before us. We "may decide the record is adequate to decide

the claim or may choose to preserve the claim for determination under chapter 822." Iowa Code § 814.7(3) (2018).

Trane's burden of proof is well-established:

> In order to succeed on an ineffective-assistance-of-counsel claim, a defendant must prove each of the following two elements by a preponderance of the evidence: (1) trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.

*State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015) (quoting *State v. Dalton*, 674 N.W.2d 111, 119 (Iowa 2004)).

Trane asserts that his counsel was ineffective in failing to move for severance of counts I and II from count III, in not objecting to testimony by Dr. Salter that vouched for K.S.'s credibility, and in not challenging a marshaling instruction on child endangerment that lumped A.H. "and/or" B.V. together.[11]   All claims are raised as ineffective assistance because Trane's counsel did not preserve these points with a pretrial motion or contemporaneous objections.

"We normally preserve ineffective-assistance-of-counsel claims for postconviction-relief proceedings." *State v. Brown*, 930 N.W.2d 844, 844 (Iowa 2019).  For a couple of reasons, we think that is the prudent course here.  This will give Trane's trial counsel a full opportunity to explain her actions.  In addition, it will facilitate consideration of "the cumulative effect of the prejudice arising from all the claims." *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012).

Ordinarily one might have expected a motion for severance in a case like this.  The sexual abuse and sexual exploitation charges involved a different kind of misconduct, carried out in a different way, against a

---

[11]As part of his improper vouching argument, Trane also asserts that A.H.'s mother was allowed to bolster the credibility of A.H., who did not testify at trial.

different victim than the child endangerment charge. But Trane's trial counsel should get a chance to explain why she did not move for severance. Indeed, Trane's present counsel wanted to go into this subject during the new trial hearing and was not allowed to do so. *See* Trial Tr. 115 ("I also would have wanted to know why she didn't ask for severance in this case."). It is possible that, as with the decision to insist on a speedy trial, this was a client call.

Trial counsel also may have had tactical reasons for not objecting to questioning of Dr. Salter. In any event, it appears that some of Trane's salvos on appeal relate to alleged lack of relevance or unfair prejudice, not vouching. *See* Appellant's Br. 61 ("Salter 'educated' the jury by likening Trane to: (1) widely known acts of terrorism, (2) a headline-grabbing sexual predator, and (3) other high-status offenders . . . .").

Lastly, from our vantage point, we have concerns about the "and/or" marshaling instruction on child endangerment. We think an identifiable victim—i.e., "a child"—is an element of the offense. *See* Iowa Code § 726.6(1).[12] The instruction here could have allowed the jury to find that the defendant had custody or control of B.V. while knowingly acting in a manner that created a substantial risk to A.H.'s physical, mental or emotional health or safety. Or it could have allowed different jurors to reach a guilty verdict as to different victims. As Trane's present counsel pointed out below, the idea for this instruction appears to have originated

---

[12]This point is illustrated by Iowa Code section 726.6A, which under some circumstances punishes "a course of conduct including three or more acts of child endangerment as defined in section 726.6 within a period of twelve months involving the same child" as a class "B" penalty. This language highlights that the crime of child endangerment involves a particular child. Accordingly, we have held that the section 726.6 crime is a lesser included offense of the section 726.6A crime. *See State v. Neiderbach*, 837 N.W.2d 180, 192–93 (Iowa 2013).

with the State. Its proposed instructions used the terminology "[B.V.] or [A.H.]." The district court changed this to "[B.V.] and/or [A.H.]"

Trane's present counsel made a partial record on this issue, getting Trane's trial counsel to acknowledge that she had not proposed any instructions herself. Trane's trial counsel also acknowledged she did not review the court's instructions to see if any error in the State's instructions had crept into those instructions. Still, the district court cut off questioning on ineffective assistance during the hearing on the motion for new trial.[13] A full exploration of this ineffective-assistance claim in a potential postconviction-relief proceeding would be appropriate.

**VIII. Conclusion.**

For the foregoing reasons, we conditionally remand. The district court should conduct an in camera rule 5.412 hearing to determine whether, by a preponderance of the evidence, K.S. made false allegations of sexual abuse against her adoptive or foster parents. If false allegations were made, then Trane is entitled to a new trial. The new trial would extend to all counts, including the child endangerment count, because of the risk that all three verdicts could have been affected by the limits on Trane's ability to present a defense on the sex-related counts. If Trane does not make this showing, then his convictions and sentence should be affirmed.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

---

[13]As we discuss above, the district court did so appropriately, because a motion-for-new-trial hearing is not a permissible avenue for the resolution of ineffective-assistance-of-counsel claims. *See* Iowa Code § 814.7.